May it please the Court, Kristen Thayer on behalf of Appellant Jay Yang, I'd like to reserve five minutes for rebuttal and I'll watch my time. By searching the LEARN database to collect the record of Mr. Yang's movement in the Yukon without a warrant, the government violated Mr. Yang's Fourth Amendment rights. Isn't there a qualitative difference between your claim of Carpenter, where Mr. Carpenter could not avoid giving personal data through his telephone usage, and Mr. Yang, who could avoid his whereabouts by simply not using an automobile? I think that people could also avoid using cell phones if they really wanted to stay completely off the grid. The Court found that cell phones were an everyday adjunct of our life. I think they said 400 million cell phones in the United States. There are a lot of people, especially in this city, that don't have automobiles at all. Of course, they also don't do phishing in United States Postal Office installations. Yes, Your Honor. I would submit that the amici brief filed on behalf of Mr. Yang states that 83% of adults drive frequently, which means several times a week. So cars are used very frequently in this society still, especially in rural areas, suburban areas. There might be some more public transportation. In some cities, not every city, has as good a public transportation as here. An inventive postal office phisher using a truck could change license plates, couldn't he? He'd have to steal them, but he's also already stealing United States Postal stuff, so that's not a big deal. You could change license plates, but... You can't change your phone, but you can change license plates. I suppose, Your Honor, that's not what happened here, and that's not what... That's not what happened. But I mean, if he was so concerned with his privacy, why didn't he change license plates? I believe cold-plating a car in Nevada would be a separate offense, so that's just not what happened here, and that might impact his privacy insurance had he changed the license plate. But he didn't, and the license plate was connected to the car that he rented. He is the person turning to, I think, the standing issue. But he read it for a while, but didn't return, so it was stolen. It was not. I would like to address that. The government states that, first of all, the standing issue is the location information, not the privacy right to search the inside of a car. That's the government's line of cases. I would submit they're just not applicable here because we're looking at the location information, not physical intrusion into the car, such as the car search cases that the government relies on. But even if you consider those cases, the contract's not dispositive under the Supreme Court's Byrd decision. A violation of a rental agreement does not get rid of your reasonable expectation of privacy. Mr. Yang could have avoided the observation of his car next to his house by renting a garage. He could have kept his privacy that way. Mr. Carpenter couldn't do that. I submit Mr. Carpenter could have. Everyone could choose not to use cell phones. No, no, no. Mr. Yang could use his stolen Yukon, but simply keep it at night in a garage where nobody could see the license plate. Yes, Your Honor, but the point is that- But Mr. Carpenter couldn't very well do that with his telephone. I mean, there are differences. He could. He could turn the cell phone off. And that actually, in Carpenter, I would submit that this court, the government inflates sort of the numbers that actually determined whether there was a search or expectation of privacy in Carpenter. There was a seven-day request for information under one of the orders under the Stored Communications Act. It only returned two days of roaming data. So it actually wasn't continuous tracking for seven days. It was two days of roaming data, which is sparse, and it was only when calls were coming in and out of the phone. Footnote 3 states that only that seven-day return was sufficient. Seven-day request was sufficient to be a search. But isn't the record between Carpenter and this case different? Because in Carpenter, the Supreme Court said on average there were 101 hits, cell phone pings per day. Here, the record says the license plates are scanned on average per person four times a year. So the Supreme Court was concerned about what it called an all-encompassing surveillance. You can see if your cell phone pings 101 times a day versus four times a year in a license plate. Isn't that a significant and material difference? It is a difference, but I would submit that it doesn't make Carpenter's principles less applicable. The aggregate number of the scans in this LEARN database keep growing. There's 120 million scans being added to this database a month. Looking just at the numbers we have in this case, in 2015, there was 2.2 billion scans. 2015, there's 5 billion scans. Earlier this year, 2019, there were 6.5 billion scans. But don't we have to decide based on the record before us not what may happen in the future? I mean, you know, several years ago in L.A., there were red light cameras and there were a lot of privacy concerns. Now, they don't exist. They were all taken off. So we can't decide on what may happen four, five years, six, seven, eight years down the road. We have to decide what's on the record. And the record here, it says, on average, the license plate scanners scan four license plates per person a year. Now, that doesn't seem all-encompassing, as the Supreme Court cautioned against. The Carpenter decision actually did consider the technology at the time of the search and currently and sort of what its potential and what predictive future use reasonably based on what the technology is capable of, what it will look like in the future. That's part of the decision, that the cell site location information used to be actually quite less precise. It could have been miles or thousands of feet. It's getting a little bit closer to GPS. It still isn't there yet, according to the Carpenter decision. But the Supreme Court did acknowledge that that's significant, is the advancement of technology even from the beginning of a case to the end of a case and what could happen in the future, without speculating, of course. These numbers show that this is not speculation. This learned database run by this private company is growing exponentially every year. And there's no business reason for that company to stop doing that, to stop selling the cameras and collecting the data. As the owner of this company testified at the hearing, this is the largest database of ALPR data in the nation. That's the record at page 141. It's clear that the more data that's in the database, the more useful it is, the more the company can market it to law enforcement through the LEARN database. And law enforcement undoubtedly gets all of the private info scanned by the private companies, as well as the info scanned by other law enforcement companies that had bought these cameras. So this is a substantial privacy concern. It's similar to Carpenter. I do understand the court, the distinguishing that it might not be this comprehensive. Every single dot where you move is captured. But I would submit the precision of this, it is GPS quality. Longitude, latitude is provided every time the plates are scanned. It's not like cell site, which could be thousands of feet away. Isn't cell phone, by its nature, just more invasive than a car? So, for example, if I'm at home and I have my cell phone, you will know that I'm at home. Whereas with a license plate, I put my car in the garage, you'll have no idea if I'm home, if I'm at the supermarket or the baseball game. Isn't cell phone inherently different from a car, that it's much more invasive, that you can track where anybody is at any time? The record in this case reveals where your car is as a good indication of where you are. The record at page 337 to 38 states that 90% of the time people are within 1,000 feet of their car. So it is, yes, there are differences between cell phones and cars. But it's not different enough that it's not your car's location is still attached to you in a significant way. Let me ask you a question. I suppose that we think that your argument regarding Carpenter is applicable in this case. Carpenter hadn't been decided when this case was decided. Should we rely on the good faith exception to the exclusionary rule? Yes, or you should not, Your Honor. The government has only identified cases where, and I've been able to find, where there's a good faith reliance on something. So there's a reliance on an avowed search warrant. There's a good faith reliance on prior precedent, that it was overruled later, that was in place when the police acted. There's good faith, like in Carpenter, the cell site. There's good faith reliance on the Stored Communications Act that had been upheld by many circuits and courts in this country. So the exclusionary rule wouldn't apply to that action because there was good faith reliance. The government hasn't pointed to anything that Inspector Steele relied on to believe that his search of the learned database, without a warrant, was legal. And that's the crucial difference in this case, and that's why the exclusionary rule should apply. Of course, there's other circumstances it hasn't applied, such as police negligence or, you know, failing to update, an accidental failure to update a search warrant, or a arrest warrant database. That's not at issue here. We have deliberate action without the reliance on anything authorizing this type of intrusive search. And that's why the exclusionary rule should apply. I see I'm almost at five minutes if I reserve your time. Thank you very much. Thank you. Good morning, Your Honors. Nancy Olson appearing for the United States. May it please the Court. Keep your voice up, would you, please? Yes, I will. I'm going to actually move the mic a little closer. Thank you. Mr. Yang doesn't have standing to challenge this photo that was taken of his license plate, because he doesn't have a reasonable expectation of privacy in the plate on the outside of his car that was incidentally captured by a tow truck. You're going to have to speak up for me. I'm sorry. Sorry, just making sure that it was on. He did not have a reasonable expectation of privacy in that license plate, because it was on the outside of his car where it was required to be. It's not something that he can hide from public view. And when it was incidentally captured by the tow truck, there was no sort of privacy interest that he can claim, most primarily because at the time he was driving a stolen car. Now, the Supreme Court's recent decision in Byrd did not change that. That talked about a properly rented car that was lent to a friend, and the court in Byrd reiterated that somebody in a stolen car does not have a privacy interest in that car. That's what we're dealing with here. Well, the fact that it was beyond lease time doesn't mean it was a stolen car. That's correct, Your Honor. But if we look at the Ninth Circuit's cases dealing with whether something is stolen or not, it depends on whether the owner has started to take steps to reclaim that property. But the owner hadn't called the police and reported it stolen, hadn't done anything. No, Your Honor. The Prestige Motors had, in fact, taken steps, and I'll point you to the record. It's at page 246 and 254. The car was equipped with a GPS technology that if Prestige decided that the car was stolen, they would activate it, and it was supposed to disable the car. And the GPS had been deactivated, right? They activated it to disable it. They got the car's location, and then when they went to find it, it wasn't there because Mr. Gang deactivated that GPS. And so they took all the steps that they could at that time, and it was similar to the CUNAG case. That isn't all they could have. They could have just turned it over to the police. That's correct. And just a couple of days later, they talked with the postal inspector. And so in the CUNAG case, that involved a hotel room in which the hotel tried to exclude the occupants. They did that by reprogramming the keys. So they thought that they had successfully done what they needed to do to reclaim the hotel. Unfortunately, for some reason, they were still able to get in the room. But this court held that there was no expectation of privacy in what had been a stolen room that the hotel was trying to reclaim. So once the car company here tried to reclaim the car, those steps are sufficient under CUNAG to remove any expectation of privacy that Mr. Yang might have had when he rented the car. Even if the court reaches the merits of this case, the analogy was pointed out earlier from Carpenter. This case is a lot different. The Supreme Court was very concerned about having a comprehensive chronicle of a user's past movements. So we're talking about point-by-point, moment-by-moment, day-by-day. Where has someone been using this precise technology that the court likened to having an ankle bracelet strapped around your leg because your cell phone is always with you? In this case, we're talking about business-use tow truck and repossession companies that are going about their day-to-day business taking photographs of cars incidentally as they look for these stolen cars on behalf of mostly insurance companies and auto finance companies. And it is correct that they do sell the opportunity to law enforcement to be able to query this database. That's not their primary purpose for it. And in addition, when a query happens, the record shows that it's very hit-or-miss what you're going to get. You might get one hit. You might get zero hits. In this case, you got one. On average, you're going to get about four per year, according to the testimony from the CEO of this company. So this case is qualitatively different than Carpenter. But there's a tension in Carpenter. You know, the opinion says it's narrow, it's limited to the facts. But then, as Ms. Thayer pointed out, there's language saying we have to take into account future technologies. How do you reconcile those two competing language and the opinion? I think Carpenter at base was dealing with cell phone technology as it existed. It talked about how this is affecting Mr. Carpenter in that case, but because there's 400 million people who are subject to that with their cell phones, that wasn't really so much predicting the future. Carpenter was more about what was actually happening with cell phones and kind of being mindful of letting that run away into affecting more than just a few individuals. But in this case, we're talking about a technology that's not capable of tracking. It's not capable of creating those chronicled, detailed, encyclopedic movements that Carpenter was worried about. What if a city installs these license plate readers on every street corner? Would that be all-encompassing as outlined in Carpenter? I don't think it would be, but I think what we would have to do is if that, in fact, happened, how many street corners are we talking about, how many data points are we capturing, are they on 24-7, and those sorts of questions. But that would be a wholly separate factual scenario from this case. And so the court wouldn't need to predict whether something like that may or may not happen because it didn't happen in this case. And so the court should avoid trying to predict potential technology and should avoid trying to take into account facts that did not happen here. Carpenter 2218 says that we must take into account more sophisticated systems that are already in use or in development. So, you know, aside from the fact that there will be more and more of these license plate readers with current technology, beyond that, technology will improve so that the density of hits will improve. So you can't just say it's, you know, one in four versus the 110 or whatever in Carpenter. You have to look at the improvement both in density with current systems as well as improvement in systems. That's correct, Your Honor. There are still two differences, though. So you're talking about increasing number of hits, which could happen, but it doesn't necessarily mean that it would create this precise trail of somebody for their historical movements. And secondly, Yang hasn't pointed to anything in the record to show that any technology is currently in development that would do what he's predicting or what maybe Carpenter would be predicting. We're talking about does ALPR technology allow you to track an individual the way that... One of the problems of a case like this, they start out on kind of a humble beginnings, and there really isn't a very good record. For instance, on what you say, you know, there isn't really anything in there with regard to where technology is going. So we don't have really a very good record, it seems, that was developed below. Would you agree? As far as where the technology is going? Right. I think that's right. I think that it talked about the specifics of the LEARN database in this case, the capabilities generally as well as specifically what was going on in Nevada. But even with Carpenter in mind talking about where the technology is going, I don't think it puts this court in a position to make predictions about that. In the Norris case that the Ninth Circuit just decided last week, they cited to CARO, the Supreme Court decision, K-A-R-O, that talked about we don't do predictions or advisory opinions about where, if a search didn't happen. And in that case, the hypothetical the Supreme Court used was what if an officer was walking down the street with a parabolic microphone that could in theory have reached into homes and recorded, but if it wasn't turned on, there was nothing to analyze. Even if this was a search, what about good faith exception? What do you have to say about that? Your Honor, Carpenter was decided last year, and so this search took place two years prior. The government relied on several things in making its good faith argument. For example, this court had previously held in Diaz-Castaneda that there's no privacy interest in license plates, taking a picture of the outside of the car. The Supreme Court held similarly in Knotts. And even if you take Jones into account, which was where they placed the GPS tracker on the car, that was in 2012. So let's take the cases that say no privacy interest in a license plate, however you can't track a car with GPS. There's just simply no intersection here because neither one of those things happened. This is a photo taken on the outside of the car. So with that Supreme Court precedent, and I'll add in addition the class case from the Supreme Court said no privacy interest in the plate. So we don't have a privacy interest in the plate. Jones comes along and says you can't do a trespass. And the concurrence sort of predicts what Carpenter's going to say, which is even if you don't have a trespass, there could be an issue if you really start to get detailed GPS tracking of a car. But again, since we don't have that here, there was absolute good faith in what happened when there was one query run to a learned database to see if any hit would come up. And in this case, one hit did come up. So as I mentioned at the beginning of the argument, we don't think Mr. Yang has standing because this was a stolen car. It is distinguishable from Carpenter because it doesn't create a detailed chronology of movements. And then finally, we would ask the court if the court gets this far to not invoke the exclusionary rule and to rely on the good faith exception based on the precedent I just discussed. All right. Thank you very much. Thank you. Rebuttal? Thank you. What about those cases that your learned opponent cited that license plates are not private? Yes, Your Honor. Those cases addressed when an officer was physically viewing a car, so in real time either driving behind or seeing a car physically. Of course, Carpenter did not disturb those rulings because that is traditional surveillance. What we're talking about here is advanced technology that provides officers the ability to get retrospective historical information that they otherwise could never get. You think that Carpenter would be different if the tracking had been done by an officer? Yes. As the Knott's case states, that was the Beeper case, but the case really turned on the fact that police were actually also physically surveilling the car as it drove with the Beeper in the core form. So sort of the traditional, there's a line drawn between the traditional surveillance tools of seeing something happen in real time versus this precise GPS collection of GPS points of historical location data that's been stored from indiscriminate, it appears it's stored forever. There's no purging policy that the learned database creator could tell us about at the hearing. So that's the difference here is historical information gathered in a database that can be searched indefinitely and forever. What is it, if this is found not to be a search, what does that mean precedentially with regard to other types of electronic surveillance? I'm thinking about what the precedent is one way or the other from this case. Well, if it's found, it depends on what reason the court would find it's not a search. If it's because there's incomplete information based on the record in this case to decide whether the ALPR data is intrusive enough, that would be a case decision and it wouldn't impact any other challenges to this ALPR in the future with a more fully developed record. I will admit we did not have the benefit of Carpenter when we were running this hearing and the court really limited it to exactly what happened in this case and not sort of the full reach of this ALPR database. So that was a problem with this record on the hearing. You seem to be arguing that a potential criminal has a right to have this government not use the best source of surveillance. They can only use traditional sources because that's what he's used to. No, Your Honor, Carpenter drew that line. So Carpenter states that it's the difference between at the end of the Carpenter decision, it says we're not disturbing traditional surveillance means. Yeah, but you're saying that's the limit that the government can use without a search warrant, traditional. So you can have a policeman doing surveillance, maybe two policemen, maybe four policemen, but anything above that, technologically more advanced, violates the Constitution. Well, I think specifically here it's that human beings could not recreate this database. It's constantly scanning for license plates. So you're drawing the distinction between human surveillance and technological surveillance and saying the potential criminal has a right to have the government not use technological surveillance without a warrant. They can use it, they just need to get a warrant, yes, just as Carpenter said. Of course, cell site location information is very important for investigations. They just need a warrant with some probable cause to support it. I'd like to turn back to the standing issue really quickly. The location information here was gathered only 12 hours after the time period that the car was due back to Prestige Motors. The clause about the car would be considered stolen states that if it's not returned quote, on or before the contract due date, this was still within the day that it was due when the location information was gathered. So Mr. Yang had expectations of privacy in this location information. The contract had not even actually expired yet as of that day. It was 1130 at night when the information was gathered by the ALPR camera. Does the defendant's status change by the fact that he disabled the GPS? I mean, you have to hunt for it, and that is clearly an indication that he was considering that he had it illegally. Does that change his status in any way? We submit no because that shows a possessory interest in the car. There's nothing in the contract saying that they can disable the car with GPS. There's no indication that Mr. Yang driving the car would know that it's the rental company stopping his car versus a hacker. I also would submit that we have no idea when that disabling with the GPS occurred. We have no idea if it occurred within that 12-hour period when the ALPR data was collected on this car or sometimes later. There's about 10 days Mr. Yang had this car, and we don't know when. There's less than that. It's between April 5th and April 13th when the contract ended and the LEARN database was searched. We don't know within that period when the car was disabled with GPS. On this record, Mr. Yang has proven he has standard because he rented this car and was driving it. The government submits. No one disputes that anyone else but Mr. Yang drove this car. And more importantly, it's his location that's at issue. It's not some sort of possessory interest in the inside of the car, the contents of it. So for those reasons, we'd ask this Court to reverse. Thank you. Thank you very much, Ms. Sayre. And thank both counsel for their presentation.
judges: Bea, Lee, Piersol